IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 13, 2025

IN RE THOMAS B.

Appeal from the Circuit Court for Loudon County
No. 2023-AD-6     Michael S. Pemberton, Judge

———————————————————————

No. E2024-01710-COA-R3-PT

———————————————————————

In this case involving termination of the father's parental rights to his child, the Loudon County Circuit Court ("trial court") determined that clear and convincing evidence supported termination as to three statutory grounds: abandonment by failure to support, failure to establish paternity, and failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the child. The trial court further determined that termination of the father's parental rights was in the child's best interest. The father has appealed. Upon review, we reverse the trial court's determination that the ground of abandonment by failure to visit had not been established by clear and convincing evidence. Accordingly, we find that ground also supports termination of the father's parental rights. In all other respects, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Michael R. Stooksbury, Kingston, Tennessee, for the appellant, Thomas I.

Charlotte Mattingly, Chattanooga, Tennessee, for the appellees, Shelley S. and Josh S.

**OPINION**

I. Factual and Procedural Background

This action concerns the petition for termination of parental rights and for adoption ("Termination Petition") filed in the trial court by Josh S. ("Foster Father") and

Shelley S. ("Foster Mother") (collectively, "Petitioners") seeking adoption of Thomas B. ("the Child") and termination of the parental rights of the Child's biological mother, Alexis B., and putative father, Thomas I. ("Father").[1]

The Child was born in May 2022 at Parkridge East Hospital in Chattanooga, Tennessee ("Parkridge"), and was later transferred to Erlanger Hospital in Chattanooga ("Erlanger"). The Child was kept in the Neonatal Intensive Care Unit ("NICU") at both hospitals for a total of ninety-nine days. The Child had been born prematurely and drug-exposed, testing positive at birth for methamphetamines and amphetamines. The Child had also been born with "Pierre Robin Sequence," a condition that manifested in a cleft palate and respiratory distress syndrome. The diagnosis of Pierre Robin Sequence precipitated the Child's transfer to Erlanger in June 2022.

Father's name did not appear on the Child's birth certificate. Father asserts that he "completed paperwork at some point" during the Child's hospital stay "to establish [Father's] paternity" of the Child. However, according to Father, the paperwork became inexplicably "lost," resulting in the continued absence of Father's name from the Child's birth certificate. According to Father, he did not attempt to establish paternity of the Child following this initial attempt.

In June 2022, while the Child remained in the Erlanger NICU, the Georgia Department of Family and Child Services ("Georgia DFCS") filed a petition to remove the Child from Mother's and Father's custody to that of Petitioners based upon the Child's prenatal exposure to illicit substances and Mother's continued and "active" drug use.[2] The Catoosa County Juvenile Court in Georgia ("Georgia juvenile court") granted the petition and awarded Petitioners temporary legal custody of the Child. Thereafter, Petitioners visited the Child regularly in the NICU to ensure his proper care and to "bond with him." During this time, Petitioners received "extensive training" from hospital staff for the Child's care.

Following the first few days of the Child's life, Father did not visit with the Child at either Parkridge or Erlanger. Concerning Father's absence, Petitioners aver—and Father does not dispute—that Father never visited the Child, did not "participate in the medical training" provided by the hospital for the Child's care, was not present at the Child's discharge from the hospital, and did not participate in the Child's "post-discharge therapies." However, Father counters that he was "continually refused access to the Child" and was "eventually asked to leave the hospital altogether."

---

[1] Mother did not participate in the termination proceedings and has not filed an appeal in this action. Therefore, we do not address the trial court's termination of Mother's parental rights in this Opinion.

[2] When the Child was born, both parents were residing in Georgia.

When the Child was released from the hospital in August 2022, Petitioners brought him home to reside with them in Tennessee. At that time, the Child was on a "feeding tube" that required training to manage. Hospital staff had also implanted "mandibular extraction screws" into the Child's head that needed to be "turned" regularly to prepare the Child's jaw for future surgery and to augment the Child's ability to chew and swallow food. Medical directives from hospital staff also required that the Child attend regular therapies including physical therapy, occupational therapy, speech therapy, and feeding therapy.

On May 19, 2023, upon recommendation by the Georgia juvenile court, the Catoosa County Superior Court of Georgia ("Georgia trial court") awarded to Petitioners sole and exclusive custody of the Child. The order granting custody to Petitioners included a clause prohibiting Father from contacting the Child. After this order was entered, Father did not file any request or petition to set aside that portion of the order prohibiting him from contacting the Child.

Petitioners filed the Termination Petition in the Tennessee trial court on May 31, 2023. In the Termination Petition, Petitioners alleged that clear and convincing evidence supported the following statutory grounds for termination of Father's parental rights: (1) severe child abuse, (2) abandonment by failure to pay child support, (3) abandonment by failure to visit the Child, (4) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child, and (5) failure without good cause to establish his paternity of the Child. Petitioners also alleged that termination of Father's parental rights was in the Child's best interest. Father did not file an answer in response to the Termination Petition.

In October 2023, Father was arrested on one count each of possession of a firearm and felony possession of fentanyl with the intent to distribute. Father was later indicted for evading arrest and theft of property in July 2024. At the time of trial, Father had not yet been convicted and sentenced on the drug and firearm charges but remained incarcerated due to a federal hold related to a separate criminal charge with no release date set.

The trial court conducted the termination hearing on August 15, 2024, during which it heard testimony from Father, Petitioners, and Foster Father's father. Upon the conclusion of the hearing, the trial court instructed the parties to submit briefs addressing the question of whether the existence of a no-contact order, such as the one issued against Father by the Georgia trial court, was sufficient to prevent a factual determination of abandonment by failure to visit. On September 23, 2024, the trial court presented from the bench its ruling on the abandonment by failure to visit issue followed by its full findings of fact and conclusions of law regarding the Termination Petition. The trial court concluded by stating that the full transcript of the September 23, 2024 hearing would be included in the forthcoming final order and judgment.

On October 11, 2024, the trial court entered its final order terminating Mother's and Father's parental rights to the Child. The trial court determined that clear and convincing evidence supported the following grounds for termination of Father's parental rights: (1) abandonment by failure to pay child support, (2) failure to establish paternity, and (3) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. The trial court also determined, by clear and convincing evidence, that termination of parental rights was in the Child's best interest. Father timely appealed.

## II. Issues Presented

Father has raised the following issues on appeal, which we have restated slightly:

1. Whether the trial court erred in finding, by clear and convincing evidence, that Father had abandoned the Child by failing to financially support the Child.

2. Whether the trial court erred in finding, by clear and convincing evidence, that Father had failed to establish paternity.

3. Whether the trial court erred in finding, by clear and convincing evidence, that Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child.

4. Whether the trial court erred in finding, by clear and convincing evidence, that termination of Father's parental rights was in the Child's best interest.

Petitioners have raised the following additional issue, which we have also restated:

5. Whether the trial court erred in determining that Petitioners had failed to present clear and convincing evidence to support a finding that Father had abandoned the Child by failing to visit the Child.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against

- 4 -

those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

The trial court determined that Petitioners had failed to prove against Father the alleged grounds of severe child abuse and abandonment by failure to visit the Child. Petitioners have not challenged the trial court's ruling as to the ground of severe child abuse. Although our Supreme Court has instructed that this Court "must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," *see In re Carrington H.*, 483 S.W.3d at 525-26, we have not interpreted this instruction "to mean that this Court must also review grounds that the trial court found were not sufficiently proven when the party who sought termination does not challenge that ruling on appeal." *In Re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *5 (Tenn. Ct. App. Mar. 8, 2023) (quoting *In re C.S.*, No. E2019-01657-COA-R3-PT, 2020 WL 2066247, at *3 (Tenn. Ct. App. Apr. 29, 2020)). Accordingly, we will not review the trial court's determination that the statutory ground of severe child abuse, as it pertains to Father, had not been proven by clear and convincing evidence. However, because Petitioners have challenged the trial court's ruling as to the ground of abandonment by failure to visit the Child, we will address that ground. *See id.*

IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current)[3] lists the statutory requirements for termination of parental rights, providing in relevant part:

---

[3] Unless otherwise noted, throughout this Opinion, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the section that was in effect at the time the Termination Petition was filed has not changed and therefore remains current.

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

   (1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

   (2)     That termination of the parent's or guardian's rights is in the best interests of the child.

A.  Statutory Abandonment by Failure to Support

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

   (1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) in effect when the Termination Petition was filed provided the following definition of abandonment as pertinent here:

For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:

   (i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent

- 7 -

or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

At the outset, the trial court noted that Father, through counsel, had acknowledged that he had not asserted any affirmative defenses concerning any of the alleged statutory grounds for termination. The trial court concluded that Father had therefore waived the right to assert any affirmative defenses. The trial court then determined that Father had abandoned the Child by failing to financially support the Child during the relevant four-month statutory period, which it found began on January 30, 2023, and ended on May 31, 2023 ("Determinative Period"). Although the trial court incorrectly included one extra day in the Determinative Period, such error is harmless because the court "made sufficient findings of fact that encompassed the correct determinative period[.]" *See In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *5 (Tenn. Ct. App. Nov. 10, 2022); *see, e.g.*, *In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citation omitted).

The final order included the following specific findings regarding this ground:

The Court finds clear and convincing evidence that [Father] abandoned the [Child] by failing to pay child support. [Father] testified that he did not have money to pay support. However, he was not incarcerated for the first seventeen months of the [Child's] life, including the entire [Determinative Period]. [Father] testified that he worked doing HVAC work during this time frame, for approximately forty to fifty hours per week at $16.00 per hour. The Court finds this reflects an income of approximately $656.00 per week. [Father] admits he did not pay support during this time frame.

On May 19, 2023, the Georgia trial court had ordered Father and Mother to "pay child support to [Petitioners] in the amount of $264.00 each per month." We note that this order was entered very near the end of the Determinative Period, only twelve days before Petitioners filed the Termination Petition. To this point, Father argues that "enforcement of the child support order was the responsibility of the Georgia administrative regime," and that said "regime" failed to exact any "meaningful attempt to collect on the child support award." Father continues that he was unaware that he owed child support and that he had a "genuinely held belief" that he was "not allowed around the [C]hild, support or otherwise." At trial, Father admitted that he had never paid any

child support and stated that this was because "the [Child's maternal] grandmother was already supposed to be doing so."

We find Father's argument that he was unaware of his child support obligation, as well as his attempt to assign blame for his failure to meet that obligation to the Georgia authorities and to the Child's grandmother, to be unavailing. It is well settled in Tennessee that a parent maintains an obligation to provide child support and is taxed with knowledge of that obligation even in the absence of a court order. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("In Tennessee . . . the obligation to pay [child] support exists even in the absence of a court order to do so.") (citation omitted). The onus was on Father, not on the Child's grandmother or the Georgia trial court, to ensure that Father met his financial obligation to the Child.

Father also questions the reasonableness of the amount of court-ordered child support payments. Father avers that although he was "making a fair income" during the Determinative Period, he was "encumbered by a significant debt to his father, which took around half his income." However, at no time during the proceedings did Father ever seek a reduction of the child support amount or attempt to make "reasonable payments toward the support of the child." *See* Tenn. Code Ann. § 36-1-102(1)(A). Moreover, Father did not reach out to Petitioners to provide even token support or any other offer of financial assistance toward the care of the Child. Father admits that he did not provide the Child with <u>any</u> amount of financial support during the Determinative Period or otherwise. Father's purported debt notwithstanding, his failure to provide any financial support for the Child during the Determinative Period suffices to establish this ground for termination. Therefore, we affirm the trial court's conclusion that the ground of abandonment by failure to support had been established by clear and convincing evidence.

### B. Statutory Abandonment by Failure to Visit

Concerning this ground, the trial court determined as follows:

The Court does not find clear and convincing evidence that [Father] failed to visit. As [Father] raised in his brief, the final order from [the Georgia trial court] permits him no contact with [the Child]. [Father] was present at the child's birth, but only saw the child one or two times. [Father] testified that Petitioners did not allow him to visit. [Father] testified that he tried to step back and allow [M]other's family to handle things, and let his guard down regarding the Georgia litigation. The Court finds that Father was under a no-contact order for eight days during the

relevant statutory period. While the Court finds that [Father's] credibility during his testimony was poor, the Court also finds, as a practical matter, that he did not have time to take action to ask that the no-contact order be modified or lifted.

After the termination hearing concluded on August 16, 2024, the trial court ordered the parties to brief the singular issue of abandonment by failure to visit. After the briefing was complete, the trial court read aloud from the bench its findings of fact and conclusions of law relative to the ground of abandonment by failure to visit:

> Now, as [Father] pointed out in his briefing, there was an order down from the [Georgia trial court] that was a no-contact order. Now it only encompassed, I think . . . either eight or nine days of the [Determinative Period], which [Father] was legally restricted from visiting. But in respect to the failure to visit, [Father] was present at the birth, but has only seen the Child once or twice he said, and was obviously, as he said, banned from visiting the Child. He's had no contact with the Child since the day or two after [the Child] was born. He testified he had no idea the Child who had health issues when it was born was transferred from Parkview Hospital in Chattanooga to Erlanger in [] Chattanooga as well. He does agree that he was, quote, "around the mom for the first week after the child was born to do whatever I could to help." He stated he went to the [NICU] the last day he was there, and he was told he could no longer—or he was no longer allowed to go inside the NICU to visit the Child. [Father] said that the Petitioners have not let him be around the Child, and that they had tried to stop him and everybody associated with him. He said he left the hospital once he was told by the hospital, and has not visited the Child since.
>
> He said he tried to step back and let the mother's family take care of that. Now, he testified he wanted a relationship with the Child but did not think he was allowed to have a relationship because of, quote, "the way things went down at the hospital." He testified—although, I will tell you his credibility was poor in the Court's evaluation. But he testified he filled out every single form at the hospital, but, quote, "it just never happened." [Father] was talking about the birth certificate, him being listed as the father and establishing paternity in that regard. As to the Georgia case he said he let his guard down because he thought the mother's grandmother was getting the Child, not the Petitioners. He said he never intended to abandon the Child. He did testify that the Child was a couple of months premature, and that it was clear from the Petitioners' action that they were trying, as I said, to keep the Child from him. . . . [Father] was as the Court noted, prohibited from visiting the child during the [Determinative Period], albeit only for eight or nine days at the end of that period.

- 10 -

The Court has reviewed the briefs that the parties were asked to submit on this issue. . . . And specifically finds though that this case is factually [inapposite] to the [*In re Adoption of Angela E. et al.*, 402 S.W.3d 636 (Tenn. 2013)] case cited by Petitioners. The main factual difference here, [Father] did not at the time legally take action during the last eight or nine days of the relevant statutory period, unlike the father in the *In* [*re Adoption of*] *Angela E.* case, where he had. And the Court found [the father in *Angela E.*] had ample time to pursue his legal action, which he had filed, but had let it die—officially die on the vine. Here [Father] was legally prohibited from visiting [the Child] during the [Determinative Period], simply did not have enough time to take the necessary legal action. So therefore, on the statutory ground of abandonment by failure to visit, the Court finds that the Petitioners have not proven by clear and convincing evidence that statutory ground.

In their appellate brief, Petitioners argue that the trial court erred in finding that they had failed to establish against Father, by clear and convincing evidence, the ground of abandonment by failure to visit. Petitioners acknowledge that Father had been prohibited from visiting the Child for the last several days of the Determinative Period and concede that in some instances, an order preventing a parent from having contact with a minor child "can serve as a basis to deny an abandonment ground" (citing *In re C. N.*, No. M2020-01021-COA-R3-PT (Tenn. Ct. App. Jan. 20, 2022)).

However, Petitioners advance that "from at least August 14, 2022 until the time of the [Georgia trial court's May 19, 2023] no contact order," Father never "requested contact, formally or informally" with the Child. As such, Petitioners contend that the facts of this case resemble those of *In re Adoption of Angela E.*, 402 S.W.3d 636 (Tenn. 2013). In *Angela E.*, the trial court had suspended the father's visitation with his children until he filed a petition for reinstatement of his visitation rights. *Id*. at 638. The father filed the petition, but it was later dismissed because the father failed to appear at the hearing for reinstatement. *Id*. at 642. Two years passed with no action from the father until after the termination petition was filed. *Id*. The Tennessee Supreme Court concluded:

> [T]he prior order suspending Father's visitation rights did not preclude a finding that Father willfully failed to visit the children. A preponderance of the evidence supports the conclusion that Father willfully failed to visit his children between July 2003 and July 2005. Although Father filed a petition to reinstate his visitation rights, he took no action to advance the petition. Father had no reasonable excuse for failing to pursue the petition to reinstate visitation during those two years. We therefore conclude that the record contains clear and convincing evidence supporting termination of

Father's parental rights on the ground of abandonment based on willful failure to visit.

*Id*. at 642.

Viewing the facts of this case alongside our Supreme Court's conclusion in *Angela E.*, we agree with Petitioners that the trial court erred in finding that the ground of abandonment by failure to visit had not been established by clear and convincing evidence. As Petitioners correctly assert, Father had not demonstrated the behavior of "a parent actively trying to maintain visitation with his child." Although Father had been present at the hospital during the first few days of the Child's life, Father had not followed through to ensure that he had properly filed the paperwork to establish his paternity. Even after Father learned that his name was not included on the Child's birth certificate, Father did nothing. Regarding Father's assertion that he was "banned from visiting" the Child while the Child remained in the hospital, Father never filed a petition with any court to assert his parental rights to the Child and never reached out to hospital staff or the Petitioners to arrange visitation with the Child. The record is also devoid of any indication that Father had so much as inquired about the Child's well-being during the Child's care in the NICU or after Petitioners took the Child home to live with them.

Father posits that he did not pursue contact with or paternity of the Child because he was under the impression that Mother's family was "handling" it; however, we find such postulate disingenuous. Father testified that "mother's grandmother" "already had "stuff in motion to try and get [the Child]" and that Father was under the impression that he was not permitted to contact the Child even before the Georgia trial court prohibited contact. However, there is no evidence that Father maintained contact with Mother's grandmother or anyone else in Mother's family to determine the Child's whereabouts or medical condition in the weeks and months following the Child's birth. On this point, we note that the trial court found Father's testimony to be less than credible, and we afford great weight to the trial court's credibility determinations. *See Jones*, 92 S.W.3d at 838.

Significantly, the Georgia trial court order prohibiting contact between Father and the Child was not entered until May 19, 2023, over one year after the Child was born and very near the end of the Determinative Period. During the intervening time, Father took no legal action to reunite with the Child, made no overtures to establish contact with the Child, and failed to financially support the Child. Indeed, Father took fewer steps to reunite with the Child than the father in *Angela E.*, who had filed a petition requesting a reinstatement of his visitation rights. *See In re Adoption of Angela E.*, 402 S.W.3d at 636. For the foregoing reasons, we find that the ground of abandonment by failure to visit was established by clear and convincing evidence, and we reverse the trial court's determination as to that ground.

## C. Failure to Establish Paternity

The trial court determined that an additional ground for termination existed based upon Father's failure to establish his paternity of the Child. Tennessee Code Annotated § 36-1-113(g)(9) provides for termination of parental rights of a person "who is not a legal parent at the time of the filing of a petition to terminate parental rights" when that person "has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity[.]" Concerning this ground, the trial court determined:

> The Court finds clear and convincing evidence that [Father] failed to establish paternity of the [Child]. [Father] testified that he filled out paperwork, presumably a voluntary acknowledgement of paternity, at the hospital after [the Child] was born. He later learned the child did not share his last name. [Father] testified that the hospital paperwork just disappeared. However, despite realizing he was not on the birth certificate, he took no steps to remedy that error. [Father] has other children who do share his last name and for whom he has been established.

In his appellate brief, Father concedes that he "had notice of the [C]hild" because Father was "present at the hospital at birth." As noted above, Father avers that at the hospital he "filled out all the necessary paperwork for [the Child] to have [Father's] last name" but that "at some point, this paperwork was lost." Father admits that in the "intervening time, Father still failed to establish paternity." However, Father claims that he only intended the paperwork to endow the Child with Father's last name and he did not intend for the paperwork to establish paternity because "in [Father's] mind, his paternity was clear: no one disputed that he was the [C]hild's father."

Despite Father's protests that he thought his "paternity was clear," Father was aware that the Child's name was different from his own on the birth certificate, as evinced by Father's testimony during trial and his purported attempts to have the Child's last name changed to Father's at the hospital. Father testified that he learned that the Child still did not have his last name "almost immediately" "whenever [the Child] was in the NICU." However, according to Father, once he learned that the Child still did not bear his last name, he did not pursue steps to establish paternity because he "didn't know what to do."

Upon review of these facts, we determine that the record is consistent with the trial court's finding that Father failed to establish paternity of the Child. For these reasons, we affirm the trial court's conclusion that this ground was established by clear and convincing evidence.

## D. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court found clear and convincing evidence establishing that Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides for termination when:

[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show, by clear and convincing evidence, that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to her welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong of this statutory ground, our Supreme Court has instructed:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

- 14 -

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

Here, the trial court found that this ground had been established by clear and convincing evidence as to Father based upon Father's arrest in October 2023 "on a federal firearm charge, with local state felony charges regarding drugs." The court acknowledged that Father had not yet been convicted of those charges at the time of trial, but in terms of Father's ability to care for the Child, the trial court noted that Father was "being held without bond with no pending court date."

We find that the evidence reviewed above supporting the ground of abandonment by failure to support is salient with respect to this ground as well. Father did not at any time support the Child financially despite having earned a "fair" wage for approximately seventeen months of the Child's life prior to Father's incarceration. As to Father's willingness to assume physical and/or legal custody of the Child, Father failed to take the necessary steps to establish paternity of the Child despite admittedly knowing that the Child did not bear his name. Father did not attempt to visit the Child in the hospital after a few visits shortly after the Child was born at Parkridge. Despite Father's protestation that he did not visit the Child following the first few days of the Child's life because Petitioners "made it to where [Father] couldn't go back [to the NICU]," Father admitted at trial that he did not have "proof" that Petitioners had blocked him from visiting the Child. After the Child went home with Petitioners, Father did not attempt to visit with the Child and did not file any legal action to gain visitation with the Child.

As to Father's ability to assume physical custody of the Child, Father testified that before his incarceration in October 2023, his own housing was unstable in that he was struggling to afford a place to live and was residing at "extended stays." During the hearing in August 2024, Father remained incarcerated with no known release date. Upon review, we find that the evidence in the record supports the trial court's finding that the first prong of this statutory ground for termination had been established by clear and convincing evidence.

With respect to the second prong of this ground, Father's continued incarceration at the time of trial also supports a determination that returning the Child to Father's custody would pose a substantial risk of harm to him. Moreover, the Child had lived with Petitioners for nearly two years and had never known any other home besides that of Petitioners from the time he came home from the NICU. This Court has previously determined that removing a child who has "bonded and thrived" with her current family amounts to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*,

No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year).

Regarding the Child's relationship with Petitioners, Foster Mother testified that she and Foster Father visited the Child in the NICU "every day throughout the night," traveling "back and forth for work" so that Petitioners could "bond" with the Child and ensure that he was "getting good care" in the NICU. Foster Mother further testified that she and Foster Father had received training regarding proper care for the Child once they brought him home from the hospital, including training on how to administer medications and necessary "breathing treatments" and how to feed the Child through his "feeding tube." Since the Child had come to reside with Petitioners, they had been arranging for the Child to attend regular occupational, physical, speech, and feeding therapies and had been monitoring and administering the Child's complex regimen of medications and care for his feeding tube. Foster Father's testimony corroborated that of Foster Mother concerning the specific medical care and therapies the Child needed.

Foster Mother's testimony further evinced that the Child had developed strong family ties with Petitioners and their family, including with Foster Father's parents and siblings and Foster Mother's mother and cousins. Foster Mother further explained that the Child "loves to be outside" and that he "loves trucks." She recounted that she and Foster Father would take the Child on outings to the "Little Gym," to the local library, and to the mountains, and that the Child enjoyed a "dedicated space" and his own room in their home. Both Foster Mother and Foster Father described in detail several play activities that the Child enjoyed with them and their extended family. Both Petitioners expressed a desire to adopt the Child should he become available for adoption.

Upon review, we determine that the evidence supports a finding that the Child had bonded with Petitioners and their extended family, that his medical needs were being met, and that he was thriving in Petitioners' care. Additionally, the evidence strongly supports a finding that Father is a "virtual stranger" to the Child, such that even if Father were not incarcerated and the Child could be restored to Father's custody, the Child would be at a risk of substantial psychological harm. *See In re Braelyn S.*, WL 4200088, at *17. Accordingly, we determine that the second prong of this statutory ground has been established by clear and convincing evidence. We therefore affirm the trial court's finding that this ground had been established by clear and convincing evidence.

V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182

S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of

- 19 -

statutory factors weighing in favor of or against termination. <u>White v. Moody</u>, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. <u>See In re Audrey S.</u>, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. <u>In re Carrington H.</u>, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." <u>In re Audrey S.</u>, 182 S.W.3d at 878 (citing <u>White v. Moody</u>, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case at bar, the trial court considered each of the best interest grounds and determined that several of them weighed in favor of terminating Father's parental rights. The trial court accordingly concluded that termination of Father's parental rights was in the Child's best interest. Upon careful review, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

The trial court found that factors (F), (G), (K), (L), and (T) were not applicable to the instant case. Upon review, we agree with the trial court as to these factors. Concerning factor (N)—whether the parent or other persons residing with or frequenting the home of the parent has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any child or adult—the trial court did not make a determination regarding Father but concluded that Mother had "severely abused" the Child by "exposing him to drugs in utero." Upon our independent review, we determine that factor (N) weighs neutrally as to Father. The only evidence regarding Father's interaction with the Child was Father's testimony that he had come to the hospital during the Child's early days to "hold him and feed him and do all of that" and that he "love[d] his son when he was born." There is nothing in the record indicating that Father and Mother together exposed the Child to drugs or that Father was aware of Mother's drug use while she was pregnant with the Child. Additionally, there is no evidence that Father was ever abusive toward the Child or toward any other children.

With respect to factor (A)—the effect termination will have on the child's critical need for stability and continuity of placement—and factor (B)—the effect a change of

caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition—the trial court weighed these factors in favor of termination. The trial court stated that Petitioners' home was the "only home [the Child] has ever known" and that there the Child was "thriving by all accounts." The trial court noted that in the parents' absence from the Child's life, Petitioners had been "minding the gap and providing for the emotional and medical condition" of the Child, including "seeing him through his long-term NICU stay while he went through withdrawal." The evidence in the record preponderates in favor of the trial court's determination as to factors (A) and (B).

Factor (C) concerns whether the parent has demonstrated continuity and stability in meeting the Child's basic material, educational, housing, and safety needs, and factor (D) considers whether the parent and child have a secure and healthy parental attachment or whether there is a reasonable expectation that the parent can create such an attachment. The trial court weighed each of these factors in favor of termination, stating that neither parent had demonstrated the ability to meet the Child's basic medical needs and that the Child did not know either Mother or Father. It is undisputed that Father had not had contact with the Child since the Child's first days in the hospital in May 2022 and that Father was not familiar with the Child's multiple "special" medical needs, including maintenance of a feeding tube, care of a "mandibular jaw screw" that needed to be "turned" regularly by Petitioners, and regular therapy sessions. Additionally, Father remained incarcerated at the time of trial on firearm and drug charges with no projected release date. Upon review, we determine that the evidence presented at trial is consistent with the trial court's determination as to these factors. For the same reasons, we determine that factor (J)—whether the parent has demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent—also weighs in favor of termination of Father's parental rights. In addition to a complete absence from the Child's life and lack of knowledge of the Child's medical needs, Father clearly did not possess a stable home environment in which the Child could thrive.

Regarding factor (E)—whether the parent has maintained regular visitation or other contact with the child—the trial court simply stated that neither parent had maintained visitation and contact with the Child. For the same reasons that we determine the ground of abandonment by failure to visit had been established, we agree that this factor weighs in favor of termination of Father's parental rights.

The trial court weighed factors (H), which involves whether the child has created a healthy parental attachment with another person or persons in the absence of the parent, and (I), concerning whether the child has emotionally significant relationships with persons other than parents and caregivers and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage, in favor of termination. The trial court articulated that the Child had created a

"healthy attachment" with Petitioners and that the Child had developed a "bond with the extended family of Petitioners."

The evidence preponderates in favor of the trial court's findings as to factors (H) and (I). Petitioners testified that the Child began calling them "mama" and "papa" shortly after he learned to speak and that the Child had become well acquainted with Petitioners' extended family, including Petitioners' parents, siblings, and cousins, who visited Petitioners' home regularly. As to the Child's family heritage, Petitioners explained that Petitioners were "distant relatives" of Mother through Foster Mother's grandparents. Thus, in addition to the Child's bond with Petitioners and their extended family, the Child would also have access to his biological family heritage through his life with Petitioners.

As to factor (M)—whether the parent has demonstrated a sense of urgency in establishing paternity of the Child—the trial court stated that neither parent had demonstrated urgency "through their actions (or absence)." We agree with the trial court and determine that this factor weighs in favor of termination of Father's parental rights for the same reasons that we concluded that the ground of failure to establish paternity had been established by clear and convincing evidence. As to factor (O)—whether the parent has ever provided safe and stable care for the child or any other child—the trial court noted that "Father has other children who are not placed in his custody." At trial, Father testified that he had three minor children besides the Child but that they lived with their mother and Father did not have custody of them. There was no evidence presented that Father's three other children had ever resided with Father. Hence, factor (O) weighs in favor of termination.

The trial court determined that factor (P), which questions whether the parent has ever demonstrated an understanding of the basic and specific needs required for the child to thrive, weighed "strongly" in favor of termination because neither parent had "any idea of the [Child's] medical conditions or ongoing health needs." We agree. Father had been absent from the Child's life from the time the Child was days old and testified that he was not sure how many months premature the Child had been born, how long the Child had been in the NICU, or when the Child had been released from the hospital. Father had not attended the medical training provided during the Child's stay in the NICU and was not familiar with the Child's ongoing therapies or the necessary procedures, maintenance, and special medications required to care for the Child.

Factors (Q)—whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive—and (R)—whether the physical environment of the parent's home is healthy and safe for the child—are closely related factors that the trial court determined weighed "strongly" in favor of termination because "neither parent has a stable home." We agree and reiterate that Father was incarcerated at the time of trial.

Additionally, Father testified that prior to his arrest in October 2023, he did not have stable housing and was staying in "extended stays." Father further stated that he "barely had enough" money to support himself to a point where he "had a home to go to."

Finally, factor (S) concerns whether the parent has consistently provided more than token financial support for the Child, and the trial court determined that Father had not provided "any support, even token support." The evidence presented relative to the ground of abandonment for failure to support the Child preponderates in favor of termination as to this ground.

For the above-stated reasons, we affirm the trial court's conclusion that clear and convincing evidence established that termination of Father's parental rights was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we reverse the trial court's judgment concerning the statutory ground of abandonment by failure to visit the Child and determine that Petitioners had established this ground by clear and convincing evidence. We affirm the trial court's judgment in all other respects, including the court's termination of Father's parental rights. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and for collection of costs assessed below. Costs on appeal are assessed to the appellant, Thomas I.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE